761 A.2d 1125

COMMONWEALTH of Pennsylvania, Appellee,

v.

Paula DOWDS, Appellant.

Supreme Court of Pennsylvania.

Submitted March 8, 2000.

Decided Nov. 22, 2000.

378

David S. Shrager, Philadelphia, for P Dowds, Appellant.

Robert A. Willig, Pittsburgh, for Commonwealth of PA, Appellee.

Before, FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

In this appeal, we must assess the validity of an airport encounter between Appellant and law enforcement officers.

On January 24, 1996, Trooper Anthony Ravotti of the Pennsylvania State Police and Officer Gary Petruzzi of the Allegheny County Police Department were assigned to narcotics interdiction at the Pittsburgh International Airport. Their duties consisted, *inter alia*, of observing passengers on incoming flights from "source cities," such as Los Angeles and New York. While watching passengers disembark from a Los Angeles flight, Trooper Ravotti noticed Appellant, Paula Dowds ("Dowds"), a well-dressed African–American woman wearing a long black fur coat, who was the last person to leave the plane. This struck Trooper Ravotti as unusual, since the flight attendants generally exit after the passengers. Dowds was holding a large, powder blue carry-on bag that was stained with what appeared to be tar. Trooper Ravotti related his observations to Officer Petruzzi, and they began following Dowds as she slowly proceeded along the main concourse of the airport, scanning the area along the way, at one point dropping her bag and dragging it. The officers thought that this conduct was unusual considering Dowds' expensive attire. On several other occasions, Dowds stopped and appeared to perform a 360–degree scan of the area. When Dowds reached the connecting gate for New York's LaGuardia Airport, she used a payphone, making several calls of short duration, then stood at the payphone with her finger on the hang-up lever. Officer Petruzzi asked an airline attendant at the gate to check the passenger manifest for females with connecting

flights from Los Angeles to New York, and was advised that only two individuals were listed, both males. Officer Petruzzi then went to the baggage matrix and discovered a suitcase for the New York flight with a computer-generated registration for "Paula Douds" and a handwritten tag for "Paula Dowds." Further, he asked an airline agent to re-check the New York flight's passenger list, and on this occasion was advised that a "Paula Douds" was listed and had registered a piece of luggage. An officer was stationed to watch Dowds' suitcase, and a canine officer was summoned.

At this point, Officer Petruzzi and Trooper Ravotti approached Dowds, identified themselves, explained that they worked in narcotics and contraband interdiction, and that they would like to talk to her, to which Dowds agreed, later testifying that Officer Petruzzi "was very kind." Officer Petruzzi and Trooper Ravotti were wearing plain clothes and carried no visible weapons. Dowds was asked to produce her airline ticket, which she did. The ticket indicated a last name of "Douds" and its folder evidenced a tear where a baggage claim tag is normally affixed. Dowds also produced a New York driver's license, showing her last name as "Dowds." When asked if she had checked a suitcase for her trip to New York, Dowds stated that she had not, and upon being told that there was a bag at the baggage claim area with tags indicating both spellings of her last name, Dowds denied ownership. Officer Petruzzi asked Dowds if they could look through the bag, to which she responded, "It's not my bag. You can look through it if you want." Trooper Ravotti remained with Dowds, while Officer Petruzzi returned to the baggage matrix to arrange a canine sniff of the suitcase. Thereafter, Dowds asked Trooper Ravotti if she could use the restroom, and he advised her, "Sure. You're not under arrest. We're not detaining you at this time. You can do what you want to do." Dowds used the ladies' room and returned to the gate. During the canine sniff, the dog alerted to Dowds' suitcase, indicating the presence of narcotics. Officer Petruzzi then brought the suitcase to the gate area where Dowds was sitting, at which point she again denied ownership and told the officers that they could look inside it. Dowds was advised that

she would be detained until a search warrant could be secured. Upon receipt of the warrant, the police forcibly opened the suitcase, finding 32.76 pounds of marijuana,[1] and Dowds was charged with possession with intent to deliver a controlled substance.

Prior to trial, Dowds moved to suppress, asserting that the police lacked either reasonable suspicion or probable cause when they initially approached her, and that she was stopped solely because of her race. Dowds thus argued that the subsequent search of the luggage was tainted by prior illegality. Following a hearing, the suppression court denied Dowds' motion, finding that the initial contact between her and the police did not constitute a seizure, but rather, was a mere or consensual encounter, which did not require any level of suspicion. The court also found that Dowds' denial of ownership in the face of information to the contrary created reasonable suspicion supporting the officers' actions in subjecting her suitcase to a canine sniff. Citing the result of the canine sniff, Dowds' further denial of ownership, and other circumstantial evidence, the court concluded that the police had probable cause to effectuate an arrest. Dowds proceeded to a non-jury trial, stipulating to the facts as adduced at the suppression hearing, and was found guilty and sentenced to three to six years of imprisonment.

█ On appeal, the Superior Court affirmed in a memorandum decision, agreeing with the suppression court's conclusion that the initial interaction between Dowds and the police was a consensual encounter. In reaching this conclusion, the Superior Court relied upon the reasoning from the Opinion in Support of Affirmance in *Commonwealth v. Boswell,* 554 Pa. 275, 721 A.2d 336 (1998) (equally divided court), which addressed a similar issue. With respect to the canine sniff of the suitcase, the Superior Court determined that it was permissible, given Dowds' denial of ownership. This Court allowed appeal to address these conclusions.[2]

1. A key for the suitcase was later found on Dowds' person.

2. Our review of a suppression ruling is limited to determining whether the record as a whole supports the suppression court's factual findings

In their respective arguments to this Court, Dowds and the Commonwealth rely upon the opinions from *Boswell*. For her part, Dowds maintains that she was seized when the police initially approached her and that the seizure was unlawful, as it was not founded upon reasonable suspicion or probable cause, but rather, drug courier profile criteria of a generalized nature. As a result, Dowds claims that she was intimidated and did not "make an informed, knowing waiver of her rights." In this regard, Dowds urges this Court to adopt the reasoning set forth in the Opinion in Support of Reversal from *Boswell*, acknowledging that the average citizen does not feel that he can ignore a police officer's request for information and requiring police to advise persons whom they approach that, *inter alia*, they do not need to comply and are free to leave. Had she been so advised, Dowds asserts that she would have admitted ownership of the suitcase and instructed the officers to leave her alone. The Commonwealth responds that the circumstances surrounding the interaction between Dowds and the police establish that she was not seized, and that the contact was a mere encounter. Consequently, the Commonwealth asserts that the drug courier profile criteria are not at issue. In addition, the Commonwealth reasons that adopting the Opinion in Support of Reversal from *Boswell* would eliminate the concept of a consensual encounter, which is inconsistent with this Court's search and seizure jurisprudence. Finally, the Commonwealth contends that the search of Dowds' suitcase was proper, as her statements indicated that she either voluntarily consented to the search or abandoned any privacy interest by denying ownership.

In *Boswell*, this Court considered the nature of police contact with a defendant in the context of narcotics interdiction at the Philadelphia International Airport. There, the police approached the defendant for reasons similar to those offered in the present matter, namely, arrival from a "source city," nervous appearance, and repeated scanning of the area. After the defendant retrieved a piece of luggage and proceed-

and whether the legal conclusions drawn from such findings are free of error. *See In re D.M.*, 556 Pa. 160, 162, 727 A.2d 556, 557 (1999).

ed to leave the airport, two officers, who were in plain clothes and not visibly displaying any weapons, approached the defendant, identified themselves and asked if they could speak with her. The defendant agreed, and when the officers asked if they could look in her suitcase, she assented. The subsequent search revealed a large amount of marijuana. The trial court granted the defendant's motion to suppress; however, following a Commonwealth appeal, the Superior Court reversed, concluding that the defendant was not seized at the time she gave consent to search. This Court was equally divided on the issue of whether the defendant was subjected to a seizure at the time the police approached her.

The Opinion in Support of Affirmance noted that neither the Fourth Amendment of the United States Constitution nor Article I, Section 8 of the Pennsylvania Constitution prohibits an officer from approaching a citizen in public and making inquiries, and only when an officer by means of physical force, or by display or assertion of authority, restrains the liberty of a citizen does a seizure occur. *See Boswell*, 554 Pa. at 283, 721 A.2d at 339–40. In determining whether a seizure has occurred, the Opinion in Support of Affirmance explained that Pennsylvania has applied an objective test, which looks to the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that he was "free to decline the officers' requests or otherwise terminate the encounter." *See id.* at 284, 721 A.2d at 340 (quoting *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991)). After examining cases from both this Court and the Superior Court, the Opinion in Support of Affirmance concluded that the interaction between the defendant in *Boswell* and the police was a mere encounter, and that her consent to search was freely given. *See id.* at 290, 721 A.2d at 343. Significant to this conclusion was that the police contact occurred on the concourse of a busy airport; the officers were in plain clothes; no weapons were displayed; the defendant's path was not obstructed; the defendant was not informed that the officers were working as a drug interdiction team or advised that she

was suspected of wrongdoing; the officers' tone of voice was not authoritative, demanding or accusatory; and the defendant agreed to speak with the officers. *See id.*

The Opinion in Support of Reversal viewed all such encounters as inherently coercive, reasoning that police presence is necessarily intimidating, regardless of officers' specific dress, demeanor or actions. *See id.* at 291, 721 A.2d at 344. The opinion therefore proposed a prophylactic warning for police to issue when they approach someone based upon drug courier profile criteria, namely, that: they are police officers investigating drug traffickers; they would like to question the subject, see his identification or ticket, and obtain consent to search his luggage; and he is not required to comply and is free to leave. *See id.* at 292, 721 A.2d at 344. For each ensuing police request, the Opinion in Support of Reversal would require that the subject be explicitly informed that he may refuse to cooperate and is free to leave; in the absence of such warnings, consent would not be considered as knowingly and voluntarily tendered. *See id.*

■ As reflected in *Boswell* and in the parties' arguments, the resolution of the search issue is dependent, in the first instance, upon whether Dowds was seized when the police initiated contact with her and, if so, whether the seizure was lawful. *See generally Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000).[3] Governing such assessment, the United States Supreme Court has adopted an objective test requiring an examination of the totality of the circumstances to determine whether a reasonable person would feel free to leave. *See United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980)(opinion announcing the judgment of the Court); *Florida v. Royer,* 460 U.S. 491, 514, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion). This Court endorsed the same construct independently in *Commonwealth v. Jones,* 474 Pa. 364, 373 n. 7, 378 A.2d 835,

3. This is so even if, as the Commonwealth asserts, Dowds abandoned her suitcase, since an abandonment may in some circumstances be viewed as the product of an illegal seizure. *See Commonwealth v. Matos,* 543 Pa. 449, 462, 672 A.2d 769, 776 (1996).

840 n .7 (1977). *See generally Strickler*, 563 Pa. at 56 n. 2, 757 A.2d at 888 n. 2.

In *Jones*, the Court also acknowledged the concern that police presence is itself a show of some authority and, correspondingly, an exercise of force. *See Jones*, 474 Pa. at 371, 378 A.2d at 839. More recently, we recognized a similar dynamic in the context of a police/citizen encounter occurring after a traffic stop. *See Strickler*, 563 Pa. at 73, 757 A.2d at 898. Nevertheless, consistent with United States Supreme Court jurisprudence, the Court has declined to allocate controlling significance to such factor, but rather, has allowed for its consideration within the totality assessment. *See Strickler*, 563 Pa. at 73, 757 A.2d at 898–99; *Jones*, 474 Pa. at 372, 378 A.2d at 839 (explaining that "whether a 'stop' occurs is not dependent on the presence or absence of any force; rather, it is dependent on the amount of force exercised"). *See generally Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Although in some circumstances the presence or absence of an admonition that the citizen-subject is free to depart will be a significant factor, *see, e.g., Strickler*, 563 Pa. at 74, 757 A.2d at 899, the universal requirement of a prophylactic warning as advocated by Dowds would be inconsistent with the above precepts. *Accord Robinette*, 519 U.S. at 39–40, 117 S.Ct. at 421; *Strickler*, 563 Pa. at 74, 757 A.2d at 899.[4] Further, while the location of an encounter within an airport is a factor to be considered in the totality assessment, it also does not alter the approach governing the inquiry; indeed, the totality of the circumstances approach, in the Fourth Amendment context, developed in airport search cases. *See Mendenhall*, 446 U.S. at 547, 555, 100 S.Ct. at 1873, 1878; *Royer*, 460 U.S. at 493, 103 S.Ct. at 1321–22.

4. Moreover, although Dowds references Article I, Section 8 in her argument, she does not contend that the Pennsylvania Constitution affords her greater protection in this circumstance, nor does she develop any policy basis, such as widespread abuses by police, for an expansion of protection or the exercise of this Court's supervisory power. *See generally Strickler*, 563 Pa. at 80 n. 28, 757 A.2d at 902 n. 28 (declining to address unsubstantiated allegations of discriminatory practices as a basis for the exercise of this Court's supervisory powers); *Commonwealth v. Cleckley*, 558 Pa. 517, 528, 738 A.2d 427, 433 (1999).

■ Accordingly, it is necessary to examine the interaction with Dowds to determine whether a reasonable person in her circumstances would have felt free to leave. The officers who approached Dowds were in plain clothes, did not display weapons, identified themselves, explained their duties at the airport, and merely requested ticket and identification information, which Dowds agreed to provide. Dowds was not confronted by a large number of police officers or interrogated regarding narcotics possession, and as she testified, the officers' demeanor was polite. *Cf. Commonwealth v. Lewis,* 535 Pa. 501, 505–06, 509, 636 A.2d 619, 621–22, 623 (1994). Furthermore, unlike the circumstance where a mere encounter follows a traffic stop, Dowds was not subjected to a prior seizure. *Cf. Strickler,* 563 Pa. at 73, 757 A.2d at 898. More important, when Dowds asked to use the restroom, she was advised that she was free to leave, as she was not being detained. In addition, the suppression court credited Officer Petruzzi's testimony that had Dowds produced a baggage claim ticket and told the truth about her luggage, a canine sniff would not have been performed on her suitcase, and the police would have simply left the area. In light of these circumstances, the suppression court properly concluded that Dowds was not seized when initially approached by the police. Accordingly, her Fourth Amendment interests were not implicated by the mere fact of her interaction with police.

■ With respect to the search of Dowds' bag in the form of a canine sniff, the Commonwealth maintains that it was proper based upon consent voluntarily and freely given or, in the alternative, that Dowds abandoned any privacy expectation by disclaiming ownership in the suitcase.[5] Because Dowds repeatedly denied owning or possessing any luggage other than that which she carried, it would be unreasonable to view her statements under the rubric of consent. *See generally Commonwealth v. Platou,* 455 Pa. 258, 262, 312 A.2d 29, 32

---

**5.** This Court has held that a canine sniff constitutes a search under Article I, Section 8, and, in the absence of consent or abandonment, must be supported by reasonable suspicion. *See Commonwealth v. Johnston,* 515 Pa. 454, 465–66, 530 A.2d 74, 79 (1987).

(1973)(explaining that an individual cannot consent to waive another's Fourth Amendment privacy rights), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). In addition, to prevail on a suppression motion, a defendant must demonstrate a legitimate expectation of privacy in the area searched or effects seized, and such expectation cannot be established where a defendant has meaningfully abdicated his control, ownership or possessory interest. *See Commonwealth v. Hawkins,* 553 Pa. 76, 80, 718 A.2d 265, 267 (1998).[6] Significantly, abandonment of a privacy interest is primarily a question of intent and may be inferred from words spoken, acts done, and other objective facts. *See Commonwealth v. Shoatz,* 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976).[7]

This Court has not previously addressed whether a defendant's denial of ownership, standing alone, is sufficient to constitute abandonment. The issue was addressed by the Superior Court, however, in *Commonwealth v. Bennett,* 412 Pa.Super. 603, 604 A.2d 276 (1992), in which the defendant

6. The Commonwealth does not contest Dowds' standing to file a motion to suppress, which she is accorded automatically, as she was charged with an offense that included as an essential element possession at the time of the contested search and seizure. *See Hawkins,* 553 Pa. at 80, 718 A.2d at 267.

7. Regarding the issue of abandonment, Dowds' argument suggests that a waiver analysis should apply, requiring such decision to be knowing and intelligent in addition to voluntary. The test for abandonment, however, focuses upon "whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy." *Id.* Moreover, in the context of consent searches, this Court has held that, while a waiver analysis is appropriate to those constitutional rights necessary to assure a fair trial, it is inapplicable to those rights protected by the Fourth Amendment and Article I, Section 8. *See Cleckley,* 558 Pa. at 522, 527, 738 A.2d at 430, 433. As a similar concern is implicated in encounters resulting in either consent to search or abandonment, specifically, that the subject not be coerced, the analysis should be the same. *See generally United States v. Ward,* 961 F.2d 1526, 1535 (10th Cir.1992) (stating that the appropriate analysis for abandonment is the same as that for consent), *overruled on other grounds, United States v. Little,* 18 F.3d 1499, 1504 (10th Cir.1994) (*en banc* ). Furthermore, employing a waiver analysis to require a warning as a prerequisite to a valid abandonment would be impractical, because, in many instances, the abandonment occurs before the involvement of the officials.

denied ownership of a duffle bag when detained by police at the Pittsburgh International Airport. After reviewing federal authority on the issue, the Superior Court concluded that the defendant's disclaimer of ownership constituted abandonment. *See id.* at 612, 604 A.2d at 280;[8] *see also Commonwealth v. Wilson,* 414 Pa.Super. 302, 305, 606 A.2d 1211, 1213 (1992), *appeal denied,* 535 Pa. 658, 634 A.2d 221 (1993). Notably, a number of other jurisdictions have found abandonment based upon a disclaimer of ownership in response to police questioning. *See generally* Annotation, *Search and Seizure: What Constitutes Abandonment of Personal Property Within Rule That Search and Seizure of Abandoned Property is not Unreasonable–Modern Cases,* 40 A.L.R.4th 381, §§ 21–25.5 (2000) (collecting cases); 1 LaFave, Search and Seizure § 2.6(b), at 581–89 (same). Where, as here, an individual's disclaimer of ownership is not the product of improper police conduct and clearly indicates her intention, we can perceive no basis for treating it differently than an act from which an intention to abandon may be inferred. *Cf. Shoatz,* 469 Pa. at 554, 366 A.2d at 1220 (concluding that act of dropping luggage and fleeing sufficiently indicated abandonment of privacy expectation).

In sum, Dowds' abandonment was not the product of an illegal seizure and her repeated denial of ownership sufficiently manifested her intention to relinquish any privacy expectation held in the suitcase. Therefore, her constitutional rights were not violated by the search.

Accordingly, the order of the Superior Court is affirmed.

Justice NIGRO files a dissenting opinion in which Justice ZAPPALA joins.

NIGRO, Justice, dissenting.

I respectfully dissent from the majority opinion since I believe that the interaction between Dowds and the officers at

---

8. The Superior Court ultimately determined that the abandonment resulted from an unlawful investigative detention. *See id.* at 625, 604 A.2d at 287.

the airport constituted an unlawful seizure and that therefore, the evidence obtained as a result of the seizure should have been suppressed.

Here, as the majority notes, Dowds was approached by two officers who identified themselves and their purpose, asked to speak with her, requested her ticket, and inquired about her luggage. In support of its determination that this interaction between Dowds and the officers did not amount to a seizure, the majority relies upon the fact that the officers were in plain clothes and did not display any weapons, that they identified themselves and explained their duties at the airport, and that they "merely requested" ticket information from Dowds in a polite manner.

However, as I noted in *Commonwealth v. Boswell,* 554 Pa. 275, 721 A.2d 336 (1998)(Opinion in Support of Reversal), police officers inherently demonstrate their authority without having to display weapons or use commands or threats, especially in light of the fact that it is general knowledge that police officers carry weapons and have the power of arrest. Regardless of whether they speak in conversational tones or couch their demands in polite requests, the mere fact that they are police officers is in and of itself intimidating. From the moment the police approach a person and identify themselves, the average citizen is, in my view, seized because he or she does not feel free to ignore the police officers and go about their business.[1]

1. In *Boswell,* I set forth the following warning that should be given by the police when conducting a random stop of someone based upon a drug courier profile: ·

> We are police officers investigating drug trafficking. We approached you on a purely random basis and would like to ask you some questions. You have a legal right to decline our requests, a right to refuse to cooperate, and you are free to leave. If you choose not to leave and to comply with our requests, anything revealed through those inquiries may be used against you in legal proceedings. Furthermore, if you agree to cooperate at the outset, you may still refuse at any time to cooperate further; you may end the inquiry and leave. Do you understand that you are under no obligation to comply with our requests at this time?

*Boswell,* 554 Pa. at 292 n. 1, 721 A.2d at 344 n. 1.

Based upon the officers' interaction with Dowds in the instant case, I cannot conclude that she was free to leave. Thus, any evidence obtained after Dowds was illegally seized, including any statements she made, her ticket stub, and her luggage and its contents, was tainted by the illegal seizure and should have been suppressed. *See Commonwealth v. Stevenson*, 560 Pa. 345, 744 A.2d 1261 (2000). I would therefore reverse the Superior Court's decision affirming the order denying Dowd's motion to suppress.

Justice ZAPPALA joins in the dissenting opinion.